**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andre Awad and Katrin Awad, | No. CV 05-02498-PHX-MHM |
| Plaintiffs, | **ORDER** |
| vs. | |
| State Farm Fire & Casualty Company, | |
| Defendant. | |

This is an action to recover on a homeowners insurance policy. Plaintiff has asserted claims for declaratory judgment (first claim), bad faith (second claim), and breach of contract (third claim). This case was removed from the Superior Court in and for Maricopa County, State of Arizona, based on diversity jurisdiction. 28 U.S.C. § 1332. The parties have filed cross-motions for summary judgment (Doc. 9&15-16, 18-19), supported by their respective statements of fact (Doc. 10, 17, 20) and corresponding responses and replies. (Doc. 15, 21-24). The parties also have filed a stipulation to extend the deadlines set in the Fed.R.Civ.P. 16 Scheduling Order. (Doc. 24). The Court heard oral argument on the parties' cross-motions for summary judgment on September 8, 2006 and now enters this Order.

I.

Standard of Review.

A motion for summary judgment may be granted only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).

## II.

## Background Facts.

In May 2001, Defendant State Farm Fire & Casualty Company ("State Farm") insured Amiel Salama and Awatef Salama under policy number 03-C8-6028-5. (Doc. 10, Exhibit A). The insurance policy provided personal liability coverage as follows:

> If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:
>
>  1. Pay up to our limit of liability for the damages for which the **insured** is legally liable; ... ."

(Doc. 10, Exhibit A at page 15).

The policy contained the following definition of "occurrence": "'occurrence', when used in Section II of this policy, means an accident, including exposure to conditions, which results in: a. bodily injury; ..." (id., at page 2). The personal liability coverage contained in the Salamas' insurance policy contained an exclusion as follows:

> Coverage L and Coverage M do not apply to:
>
>   a. bodily injury or property damage:
>
>     (1) which is either expected or intended by the **insured**; or

- 2 -

>(2) which is a result of willful and malicious acts of the **insured**; ...

(id., at page 16).

On May 28, 2001, Andre Awad was assaulted by Amiel Salama in a Phoenix parking lot. When police officers arrived at the scene, they observed Amiel Salama standing over Andre Awad and Mr. Awad had an arm raised appearing as if attempting to defend himself. Defendant has submitted the police report of the incident. (Doc. 10, Exhibit B). Mr. Awad also was holding his left leg and appeared to be in pain and was complaining of injury.

Mr. Awad told the police that he had met with Mr. Salama after trying to reach Salama for a long time. Mr. Awad related that when he asked Mr. Salama for money, Salama became upset and began striking Awad with his fists. Mr. Awad also told the officers that Mr. Salama picked him up and threw him down on the ground injuring his left leg, and that Mr. Salama continued to strike him once he was on the ground.

The police officers interviewed one Sandra Sifuentes (Johnson), who allegedly had observed the incident from a distance of approximately 30 feet. Ms. Sifuentes related the circumstances as described by Mr. Awad.

On July 26, 2001, a Maricopa County Grand Jury indicted Amiel Salama for aggravated assault as occurring on or about May 28, 2001 causing a body part fracture. Maricopa County Superior Court Cause No. CR2001-010993. (Doc. 10, Exhibit C - indictment). On or about October 1, 2001, Mr. Salama entered a guilty plea for the charge of aggravated assault in Maricopa County Superior Court Cause No. CR2001-010993. (Doc. 10, Exhibit D).

On or about December 18, 2002, Mr. Awad filed a civil action against Amiel and Awatef Salama in the Maricopa County Superior Court Cause No. CV 2002-024262. (Doc. 10, Exhibit E). Mr. Awad alleged in the complaint that he had met Mr. Salama at a location on Bell Road in Phoenix and asked him for repayment of funds which Mr. Awad had loaned to Salama. Plaintiff further alleged that Mr. Salama had become angry, picked up Mr. Awad and threw him down on the ground and began hitting Mr. Awad. Mr. Awad allegedly

- 3 -

sustained a fracture to his left leg and other personal injury. Mr. Awad alleged that Mr. Salama had acted with the intention of causing harmful or offensive contact, and had in fact caused contact of Mr. Awad. Mr. Awad further alleged that the actions of Mr. Salama had been performed with an evil mind, reckless disregard of Mr. Awad's rights, and with knowledge that the actions would substantially harm Mr. Awad. Plaintiff asserted claims for battery, negligent/intentional infliction of emotional distress, and negligence.

During this state court civil action, Mr. Awad was deposed on August 7, 2003. In his deposition testimony, Mr. Awad testified that during the course of discussing the alleged debt, Mr. Salama picked up Mr. Awad, hit him on the ground more than once and continued to hit Mr. Awad's face after Awad had been thrown to the ground.

The deposition of Mr. Salama was taken on August 15, 2003. Mr. Salama testified that he had pleaded guilty to felony aggravated assault and that he had been on top of Mr. Awad when the police arrived at the scene of the incident. Mr. Salama denied lifting Mr. Awad and then dropping him to the ground. Rather, Mr. Salama testified that Mr. Awad was intoxicated and that he (Salama) was concerned that Mr. Awad had a gun. Mr. Salama testified that he held Mr. Awad until the police arrived.

Sandra Sifuentes, now Sandra Johnson, also gave deposition testimony during the state court civil action. Ms. Johnson testified that Messrs. Awad and Salama were walking and talking when, suddenly, Mr. Salama picked up Mr. Awad and slammed him to the ground, got on top of him and started punching him. Ms. Johnson testified that she was approximately 20 feet away at the time she observed the incident.

In September 2004, Messrs. Awad and Salama entered into a Settlement Agreement, Covenant Not To Execute and Agreement. Pursuant to the terms of this agreement, Mr. Salama agreed that, in return for the Covenant Not To Execute, he would allow a Stipulated Judgment in the amount of $400,000.00 to be taken against him on Count III, Negligence, in the case of Maricopa County Superior Court Cause No. CV2002-024262. (Doc. 10, Exhibit I).

On or about July 14, 2005, Plaintiff Andre Awad filed the instant lawsuit against State Farm, seeking in part, a determination that State Farm, under Mr. Salama's homeowner's policy, had a duty to pay any judgment arising from the state court civil action.

In addition to these facts, Plaintiff has submitted a statement of facts that supports his claim that Mr. Salama was acting in self-defense. Citing Mr. Salama's deposition in the state civil suit, Mr. Salama testified that it was Mr. Awad who owed him money for work Salama had performed. Mr. Awad had called Mr. Salama at home before the night of the incident. On the evening of the altercation, Mr. Awad had called Mr. Salama to arrange the meeting and Salama assumed that Mr. Awad would be paying him the rest of the money he owed. Mr. Salama arrived at the gas station first and waited outside his car until Mr. Awad arrived and walked over to where Salama was standing. Mr. Salama then demanded that Mr. Awad pay him money. Mr. Awad threatened sex acts and violence against Mr. Salama and Salama's family. Mr. Salama testified that when he went to the meeting that night, it was not his intention to fight and he took no weapons. Mr. Salama testified that he smelled alcohol on Mr. Awad's breath and was afraid Awad had brought a gun to the meeting.

Mr. Salama stated in his deposition that when he turned to leave, Mr. Awad grabbed him from behind, inflicting an injury, and that when he turned around, Mr. Awad slapped him in the face. Mr. Salama then grabbed Mr. Awad in self-defense, causing both of them to fall to the ground. Mr. Salama believed that Mr. Awad's leg was broken somehow when they fell to the ground, although he was not sure. Mr. Salama grabbed Mr. Awad by putting both arms around his chest and under his arms. Mr. Salama testified that he did not intend to break Mr. Awad's leg, he never kicked or hit Mr. Awad's leg, and he was not aware he had done anything to break Awad's leg. Mr. Salama claimed that he was swinging his hands and arms to protect himself and trying to keep himself from getting hurt. Mr. Salama never anticipated an altercation nor intended to hurt Mr. Awad.

On November 6, 2001, before Plaintiff submitted a claim, Defendant submitted a letter to its insureds advising that if a civil complaint was filed, Defendant reserved the rights to deny indemnity. On January 20, 2003, after the complaint was filed in the underlying state

- 5 -

1  court civil action, Defendant again advised the insureds in writing that it was reserving its
2  rights to deny indemnity on all counts. On March 28, 2003, after the state civil suit was filed
3  and served on the insureds, Salama's defense counsel advised the State Farm Claim
4  Representative Brenda Robertson in writing that Mr. Salama appeared very honest and would
5  be well received by a jury. Defense counsel also related the substance of Mr. Salama's self
6  defense statements.

7  An April 7, 2003 a progress report from State Farm Claim Representative Brenda
8  Robertson stated that based on defense counsel's meeting with Mr. Salama, Salama came off
9  as a hard worker, honest, pleasant and intelligent, and that counsel believed he would make
10 a good witness. Ms. Robertson indicated there would be a good basis to argue self defense
11 or mutual combat. The insured had related that Plaintiff beats his wife and had been involved
12 in another fight. Ms. Robertson acknowledged that Mr. Salama had pleaded guilty to
13 criminal assault charges and received probation.

14 An April 29, 2003 a written memorandum from Defendant's Team Manager Don
15 Zimmerman to Section Manager Craig Heidel acknowledged that there had been a dispute
16 between Plaintiff and the insured regarding money and that the insured had advised that
17 Plaintiff had picked the fight and had attacked him when the insured attempted to walk away.
18 The insured stated that he had defended himself and had no knowledge how Plaintiff's leg
19 was broken.

20 On January 27, 2004, Defendant acknowledged the policy limits demand from the
21 Plaintiff. Defendant advised its insured in writing that it was "unable to make any offers of
22 settlement or participate in any settlement negotiations." In a memorandum dated February
23 27, 2004, Mr. Zimmerman stated that the company was leery about filing a declaratory relief
24 action and that unless it had enough information to make a definitive coverage decision, it
25 would continue to defend under a reservation of rights. Also on February 27, 2004, Mr.
26 Zimmerman sought authority to retain coverage counsel to file a motion to intervene for
27 purposes of submitting special interrogatories to the jury dealing with the coverage issue.
28

1   On April 15, 2004, Defendant's representative Brenda Robertson (Chan) recorded in
2   the claim activity log the following notation:

> Attended mediation - coverage counsel attended - no settlement took place - coverage counsel spoke with Plaintiff attorney at length regarding coverage for policy holder and reservation of rights - per defense counsel - policy holder has agreed to Morris - if Plaintiff will accept if not he will file bankruptcy and defense counsel will ask State Farm to pay for bankruptcy filing - $1,000 - $1,500 - my understanding is policyholder demand is still policy limits.

On April 20, 2004, Claim Representative Ms. Robertson recorded the following in the claim file status report:

> ... Plaintiffs are still requesting policy limits. We have advised defense counsel - we are defending under a reservation of rights but will wait for trial and special interrogatory questions to be determined by jury to determine if coverage applies. Meanwhile we attended a mediation last week at the request/demand of Plaintiff attorney. Defense attorney and coverage attorney attended. We advised Plaintiff attorney will not be paying policy limits at this time given our reservation of rights.

On August 10, 2004, the insureds' defense counsel advised Defendant of the seriousness of the claim, placing an estimated value of $500,000 on the claim, and with punitive damages, a potential verdict of $750,000 to $1,000,000. Counsel pointed out that Defendant had "denied indemnity for the altercation" and that counsel "had been aggressively pursuing a Damron Agreement with the Plaintiffs." Counsel further stated that if an agreement did not transpire, the claim would financially destroy the insureds.

On August 10, 2004, the insureds' defense counsel wrote to Defendant's Claim Representative Ms. Robertson as follows:

> [B]oth eye witnesses (Sandra Sifuentes and Richard Jelinek) have testified that they did not observe any provocation by Mr. Awad. Rather, they indicated that the parties were talking and then Mr. Salama simply picked Mr. Awad up and slammed him to the ground, and then climbed on top of him and began punching him. We will argue self-defense and provocation; however, the overwhelming probability is that Mr. Salama will be found liable for the assault. Indeed, as you know, he has already been convicted of aggravated assault, based upon a plea agreement. That conviction will be admissible in our case.

- 7 -

In a written memorandum dated September 27, 2004, Claim Representative Brenda Robertson (Chan) and Team Manager Zimmerman acknowledged receiving a copy of the Morris Agreement[1] and that the stipulated damage amount of $400,000 was reasonable and on the conservative side.

### III.

### Discussion.

Defendant has filed a motion for summary judgment as to all of Plaintiff's claims. Defendant contends that Mr. Salama's assault of Plaintiff does not constitute an accident or occurrence under the terms of Salama's homeowner's policy. Defendant further contends that, even if Plaintiff could succeed in demonstrating the existence of an "accident," insurance for Mr. Salama's assault of Plaintiff would still be precluded by the intentional acts exclusion set forth in the policy. In his cross-motion for summary judgment, Plaintiff contends that in accordance with the undisputed facts and the policy's terms and conditions, the subject policy provides coverage for the claims of negligent infliction of emotional distress and negligence which were made against Mr. Salama in the underlying state civil case. Plaintiff further contends that he is entitled to judgment on the breach of contract claim and that there is an issue of fact relating to the bad faith claim asserted in Count II.

(A) <u>Defendant's Motion for Summary Judgment</u>.

Defendant contends that Mr. Salama's insurance policy provided personal liability coverage for bodily injury "caused by an occurrence." The policy states that an occurrence "means an accident." Defendant argues, therefore, that for Plaintiff to establish coverage

---

[1] The term "<u>Morris</u> agreement" generally describes a settlement agreement in which the insured defendant admits to liability and assigns to a plaintiff his or her rights against the liability insurer, including a cause of action for bad faith, in exchange for a promise by the plaintiff not to execute the judgment against the insured. An agreement with these same characteristics entered in response to an insurer's refusal to defend the insured is generally referred to as a <u>Damron</u> agreement. See <u>Safeway Ins. Co. v. Guerrero</u>, 106 P.3d 1020, 1022 n. 1 (Ariz. 2005)(citing <u>United Servs. Auto Ass'n v. Morris</u>, 741 P.2d 246 (Ariz. 1987), and <u>Damron v. Sledge</u>, 460 P.2d 997 (Ariz. 1969)).

- 8 -

under the policy, Plaintiff must demonstrate that the occurrence at issue constitutes an "accident." Plaintiff bears the burden of demonstrating the existence of an insured event. Keggi v. Northbrook Prop. & Cas. Ins. Co., 13 P.3d 785 (Ariz. App. 2000).

In support of his argument, Defendant cites several cases, including Western Casualty and Surety Co. v. Hays, 781 P.2d 38 (Ariz. App. 1989). In Western Casualty, the court utilized the following definition of "accident" with respect to the usage of that term in an insurance policy:

> In order for there to be an occurrence under the policies, there must be an accident.
>
> The word 'accident,' as used in insurance policies, has frequently been defined as -- 'an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force' ...

Id., at 40 (citations omitted). In Western Casualty, plaintiffs sought to characterize an order by the Department of Water Resources, or the results of the order, as an accident. In finding no occurrence, the court held that the deliberate action by the Department could not be viewed as an accident. Relying on Western Casualty and decisions from other jurisdictions, Defendant contends that Mr. Salama's voluntary and deliberate actions do not constitute an accident.

Defendant notes that in the underlying state court civil action, Mr. Salama attempted to shield himself from liability under the self-defense doctrine. Defendant cites various non-Arizona cases for the proposition that a claim of self-defense does not transform voluntary and deliberate actions into an accident. See, Allstate Ins. v. Bauer, 977 P.2d 617 (Wash. App. 1999); Century Mut. Ins. Co. v. Paddock, 425 N.W. 214 (Mich. App. 1988). In Bauer, the insured was sued for wrongful death after shooting an intoxicated assailant during a physical scuffle. The court found that the insured had deliberately fired his gun at the decedent and the death was simply not the result of an accident. In Bauer, the insured had been prosecuted for criminal negligence and the subsequent wrongful death lawsuit contained allegations of negligence. The court also considered evidence that the insured had mistakenly believed that the decedent had been reaching for a gun. The Washington

1 appellate court nonetheless found that "[t]he fact that an insured performs a deliberate act in
2 self-defense in no way negates the deliberate nature of the act." Id., at 620.  Defendant urges
3 this Court to apply the same rationale here and conclude that Mr. Salama's actions were
4 deliberate and intentional based on Plaintiff's deposition testimony in the underlying state
5 civil action.

6       Defendant also argues that, even if Plaintiff can demonstrate the existence of an
7 "accident", insurance coverage for the assault would still be precluded by the intentional acts
8 exclusion of the policy.  The policy language excludes any bodily injury either expected or
9 intended by the insured or the result of the insured's willful acts.  Defendant cites the
10 "Steinmetz-Clark presumption" which can be summarized as follows:

> [T]here is a presumption of intent to injure if the act is "' virtually certain to cause injury.' ... The so-called '*Steinmetz-Clark*' 'presumption applies' ' if the nature and circumstances of the insured's intentional act were such that harm was substantially certain to result.'

14 K.B. v. State Farm and Casualty Co., 941 P.2d 1288, 1290 (Ariz. App. 1997)(referring to
15 Steinmetz v. National Am. Ins. Co., 589 P.2d 911, 914 (Ariz. App. 1979), and, Clark v.
16 Allstate Ins. Co., 529 P.2d 1195, 1196 (Ariz. App. 1975) (other citations omitted)).
17 Defendant claims that this presumption applies here because Mr. Salama's actions were
18 volitional and he is presumed to have intended the natural consequences of his acts.
19 Defendant further contends that Plaintiff should be bound by his own deposition testimony
20 in the underlying state civil action in which he essentially described Mr. Salama's actions as
21 sudden and unprovoked and that Plaintiff is thereby precluded based on judicial estoppel
22 principles from  attempting to establish coverage on the basis of a claim of self-defense by
23 Mr. Salama.

24       In his response on summary judgment, Plaintiff takes issue with Defendant's citation
25 of non-Arizona case law in support of its argument that a claim of self-defense does not
26 transform voluntary and deliberate actions into an accident. Plaintiff cites Transamerica Ins.
27 Group v. Meere, 694 P.2d 181 (Ariz. 1984); Farmers Ins. Company of Arizona v. Vagnozzi,
28 675 P.2d 703 (Ariz. 1983), and Fire Ins. Exchange v. Berray, 694 P.2d 191 (Ariz. 1984), all

- 10 -

of which involved an insured allegedly acting in self defense. In all of these cases, the court indicated that where an insured acts in self-defense, although his conduct might be with the intention of injuring another, the action might not constitute intentional conduct depending on the facts of the case. In each of these cases, the appellate court reversed the trial court's grant of summary judgment in favor of the insurance company. In Transamerica, the Arizona Supreme Court discussed the difference between the "unprovoked blow" and the blow struck in self-defense as follows:

> The unprovoked blow, such as that struck in Steinmetz or Clark, however, is different. The *unprovoked* (unprivileged) act of striking someone in the face with a fist is an unequivocal manifestation of a basic purpose or desire to cause some injury and the law will not allow the insured to evade the applicability of the exclusions by protestations of innocence. The blow was volitional, the event was in the control of the insured, and no accident or calamity beyond his control occurred. The law presumes he intended the result which was the natural consequence of his intentional act. In summary, in *Clark* and *Steinmetz*, the insured controlled the loss and thus fell within the category of risks which both the insurance contract and public policy consider uninsurable. In the case at bench [Transamerica], however, there is evidence from which the finder of fact may decide that Meere was confronted with a risk over which he had little control. His blow may not have been the result of a cognitive process, and his action may not have been 'voluntary.' Although his act was intentional, and its natural consequence was to cause injury, his basic desire or purpose may not have been to injure. The *Steinmetz-Clark* presumption does not apply.

Id., at 188. Plaintiff contends that the facts supported by Mr. Salama's deposition testimony indicate that Salama acted in self-defense and that a reasonable trier of fact could conclude that Mr. Salama was negligent when he used too much force against Plaintiff, thereby causing the broken leg.

Plaintiff also cites Republic Insurance Co. v. Feidler, 875 P.2d 187 (Ariz. App. 1994), in which the insured Davis, after drinking alcohol and smoking marijuana, stabbed one Feidler several times in the back, causing severe injuries. Davis, who pled no contest to the charge of aggravated assault for his attack on Feidler, was insured by a homeowner policy that excluded coverage for bodily injury caused by the intentional acts of an insured. After Davis assigned his rights to Feidler and Republic Insurance agreed to pay the policy limits

- 11 -

1  if a court found coverage, Republic filed a declaratory judgment action in state court. Id.,
2  at 189-90. Republic moved for summary judgment based on the policy's intentional acts
3  exclusion, arguing that under A.R.S. § 13-807, Davis' no contest plea collaterally estopped
4  Davis from denying that he acted recklessly in disregard of a known risk. Republic also
5  argued that an intent to injure is conclusively presumed when an insured violently attacks
6  another person with a knife. The trial court granted Republic's summary judgment motion,
7  finding that Davis and Feidler were precluded from denying the factual basis of the plea and
8  that the criminal proceeding had established that Davis had unjustifiably attacked Feidler
9  with a dangerous weapon with criminal intent.

10  The Arizona Court of Appeals held that the trial court had erred in granting summary
11  judgment indicating that (1) the particular mental state required for Davis to be convicted of
12  aggravated assault is not conclusive of whether Davis acted with the different mental state
13  that would exclude coverage under the intentional act exclusion; and (2) because a
14  reasonable trier of fact could reasonably infer that Davis did intend to injure or that he did
15  not, summary judgment was improperly granted. Id., at 190. The court held that the
16  *Steinmetz-Clark* presumption did not apply if Davis were so intoxicated that he lacked the
17  mental capacity to act intentionally. The court also held that §13-807 did not collaterally
18  estop Feidler because the mental state required for aggravated assault, that he acted
19  recklessly due to voluntary intoxication under relevant Arizona statutes, is not the same as
20  that required by the policy's intentional acts exclusion. The court held that "[b]ecause Davis's
21  conviction established only that he acted recklessly, Davis and Feidler [were] not precluded
22  from arguing that Davis lacked the mental capacity to intend to injure for insurance coverage
23  purposes." Id., at 192.

24  Plaintiff cites Fiedler as support for his contention that Mr. Salama's guilty plea to
25  aggravated assault does not constitute grounds to deny coverage. The mental state of
26  "intentionally, knowingly or recklessly" causing "serious physical injury" pursuant to A.R.S.
27  § 13-1203(A)(1) and 13-1204(A)(1), applies to the criminal offense to which Mr. Salama
28  pleaded guilty in the underlying criminal case. Plaintiff therefore contends that whether the

1  injury was the intended result of Mr. Salama's act or whether the act constituted reckless or
2  negligent conduct is a matter upon which reasonable minds can differ thereby precluding
3  summary judgment.

4        Defendant in its reply has distinguished <u>Transamerica</u>, <u>Vagnozzi</u> and <u>Berray</u> on the
5  ground that none of these cases analyze the insurance coverage issue from the standpoint of
6  the policy's trigger or grant of coverage regarding an "occurrence." Rather, these cases focus
7  on the exclusions within the policy dealing with intentional acts. (Doc. 22, at page 3).
8  Defendant reiterates that Plaintiff should be judicially estopped from relying on Mr. Salama's
9  deposition testimony. Defendant emphasizes that Plaintiff reached a stipulated settlement
10 with Mr. Salama resulting in a $400,000.00 judgment in the underlying state court civil
11 action and that Plaintiff should not now be permitted to adopt Mr. Salama's testimony in an
12 effort to establish insurance coverage and collect on the judgment.

13       In a diversity case, federal law applies in determining whether judicial estoppel is
14 appropriate. <u>Rissetto v. Plumbers and Steamfitters Local 343</u>, 94 F.3d 597, 603 (9th Cir.
15 1996). A party is judicially estopped from asserting a position in the course of litigation only
16 if that position is inconsistent or incompatible with an earlier position. <u>Id</u>., at 600-01. The
17 doctrine applies where a litigant "is playing fast and loose with the court." See <u>Yanez v.</u>
18 <u>United States</u>, 989 F.2d 323, 326 (9th Cir. 1993). The doctrine precludes a party from gaining
19 an advantage in litigation by initially taking one position and then seeking a second
20 advantage by later taking an incompatible position. <u>Rissetto</u>, 94 F.23d at 600. The
21 Stipulated Agreement in the underlying civil suit was reached as to the negligence claim, not
22 on the battery claim. The Court therefore cannot conclude on the present facts that judicial
23 estoppel applies to preclude Plaintiff's reliance on Mr. Salama's deposition testimony.

24       In this case, one version of the facts indicates that Mr. Salama acted deliberately in
25 assaulting the Plaintiff. Another version of the facts indicates that Mr. Salama may have
26 been acting in self-defense. Whether the injury was the intended result of Mr. Salama's act
27 or whether the act constituted reckless or negligent conduct is a matter upon which
28 reasonable minds can differ. Defendant's motion for summary judgment is denied.

(B) <u>Plaintiff's Cross-Motion for Summary Judgment</u>.

Plaintiff has moved for summary judgment claiming that the subject policy provides coverage for the allegations of negligent infliction of emotional distress and negligence asserted by Plaintiff in the underlying state civil action. Plaintiff contends that Defendant breached the insurance contract by repudiating its duty to indemnify the insureds for the negligence claims and breached its duty to treat settlement proposals with equal consideration. Plaintiff contends that there is a genuine issue of material fact as to the bad faith claim.

The Court has found that there is a genuine issue of material fact as to whether Mr. Salama's act was intentional or whether the act constituted reckless or negligent conduct. It would be premature to grant summary judgment in favor of Plaintiff on the issue of coverage for any negligence claim until this issue is resolved. Plaintiff is not entitled to summary judgment on the issue of coverage on the negligence claims.

In Arizona, insurance carriers owe their insureds the duty to indemnify, to defend, and to treat settlement proposals with equal consideration. <u>Arizona Property & Casualty Ins. Guaranty Fund v. Helme</u>, 735 P.2d 451 (Ariz. 1987). Regarding whether Defendant breached the insurance contract by breaching its duty to indemnify the insureds for the negligence claims, it appears that after Mr. Salama was charged with criminal assault, and before the underlying state civil action was filed, Defendant advised its insured that it was reserving its rights to indemnify. After the state civil action was filed, Defendant again advised its insured in writing that it was reserving the right to indemnify on all counts. (Doc. 15, at page 16). Defendant contends that it provided a defense to the Salamas throughout the underlying civil action but preserved all coverage issues regarding a duty to indemnify under the insurance contract. Defendant retained coverage counsel to intervene in Plaintiff's underlying tort action to allow a judicial determination of coverage but Plaintiff elected instead to pursue an assignment, stipulated judgment and the present bad faith lawsuit. Defendant now denies that it ever suggested that it would not stand by the terms of the

1  insurance contract dealing with indemnification and negligence claims. The sparse facts of
2  record on the issue are in dispute and summary judgment is not appropriate.

3      Plaintiff also moves for summary judgment on the ground that Defendant refused to
4  participate in settlement negotiations. The facts of record indicate that on or about January
5  27, 2004, Defendant advised its insured in writing that it was "unable to make any offers of
6  settlement or participate in any settlement negotiations." Defendant's claim activity log
7  indicates attendance at a mediation on April 15, 2004 but no settlement took place. There
8  simply are not enough facts of record to determine whether Defendant participated in good
9  faith in any settlement negotiations. Plaintiff's motion for summary judgment as to the
10 declaratory judgment and breach of contract claims is denied.

11     IV.
12     <u>The Parties' Stipulation to Extend Rule 16 Scheduling Order Deadlines</u>.

13     The parties have filed a stipulation to extend the pretrial disclosure, discovery and
14 dispositive motion deadlines set in the Fed.R.Civ.P. 16 Scheduling Order by approximately
15 120 days. (Doc. 24). The parties' stipulated request is granted. An Amended Rule 16
16 Scheduling Order shall be entered separately from the present Order.

17     **Accordingly**,
18     **IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 9) is denied.
19     **IT IS FURTHER ORDERED** that Plaintiff's cross-motion for summary judgment
20 (Doc. 18) is denied.

21     **IT IS FURTHER ORDERED** that the parties' stipulation to extend the deadlines set
22 in the Fed.R.Civ.P. 16 Scheduling Order (Doc. 24) is granted as set forth in a separate Order.
23     DATED this 29th day of September, 2006.

24
25
26
27     Mary H. Murgula
    United States District Judge
28